**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

DAVID BINEGAR,                    :

    Plaintiff,                    :

                           Case No. 3:13cv00237

vs.                    :

                           District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                    :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                    :

    Defendant.                    :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

       Plaintiff David Binegar filed applications for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") on May 1, 2008. (*PageID##* 216-

227). His applications were denied at the initial level. (*PageID#* 305). Plaintiff filed a

second set of applications for DIB and SSI in October 2009, alleging disability since

February 11, 2008, due to "[d]egenerative disc disease, back injury, chronic back pain,

protruding disc L5-s1, right side radiculopathy, aggravation of degenerative disc disease,

sacrolitis, stenosis spine, [and] depression." (*PageID#* 309).

       After various administrative proceedings, Administrative Law Judge ("ALJ")

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

Mary F. Withum denied Plaintiff's applications based on her conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (*PageID*## 70-81).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  (*PageID*## 56-59)  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record, and the record as a whole.

## II.  **Background**

### A.  **Plaintiff's Vocational Profile and Testimony**

Plaintiff was 40 years old at the time the ALJ issued her decision, which defined him as a "younger individual age 18-44."  *See* 20 C.F.R. § 404.1563; *see also PageID#* 80.  He graduated from high school, *PageID#* 119, and last worked in February 2008 doing light duty work as a mechanic.  (*PageID#* 117).  He testified he was told by his employer that they did not have any more work for him and not to come back.  (*Id.*).  He testified he worked in that job for seven years, "repairing cars, working on cars."  (*PageID#* 119).  He stated he lifted up to approximately 150 pounds as part of the job.  (*Id.*).

Prior to working as a mechanic, Plaintiff worked full-time as a commercial pest control technician for "a couple of years."  (*PageID#* 119-20).  Plaintiff stated he lifted

about 170 to 180 pounds in that job. (*PageID#* 120). Before then, Plaintiff "sold cutting tools" at a "supply company that's here in town that – they sell to all the businesses around town." (*Id.*). He worked for two companies doing this job over the course of 4 years. (*PageID#* 121). The most weight he lifted in those jobs was approximately 70 pounds. (*Id.*). Plaintiff also stated he was in the Army until 1993, working as a mechanic. (*Id.*).

Plaintiff lives with his wife and two sons. (*PageID#* 118). They currently live in a ranch style home after moving from a tri-level house because of his back issues. (*PageID#* 131). He stated he does not drive very often, although his wife and son also take him places. (*PageID##* 118-19). According to Plaintiff, back pain, depression, and the side effects of his medications limit his ability to do things. (*PageID#* 122). He used to ride motorcycles; play softball; coach basketball and football; play flag football; and was "very active." (*PageID#* 133). He stated he experiences side effects from his medication ranging "from dizziness to not knowing where I am and who I am sometimes." (*PageID#* 122). He stated he has spoken with his doctor regarding these side effects and has "taken all kinds of different medicines and had all kinds of bad reactions with them and pretty much stuck with what I take." (*PageID#* 123). He takes Vicodin and Flexiril. (*Id.*). Plaintiff testified he had back surgery and is "better than I was before the surgery, I had terrible [leg pain] – I had pain in both my legs and I don't have it anymore but I still have the lower back pain." (*PageID#* 124). Plaintiff stated he finds it difficult to bend, has trouble tying his shoes, washing his feet, washing his ankles,

and "anything that I bend and I have to stay there for any amount of time I'm in a lot of pain." (*Id.*). As to crouching and squatting, Plaintiff testified "I don't even do those." (*PageID#* 124). If he drops something, he has someone pick it up for him. (*Id.*). Plaintiff also takes an anti-depressant, which helps "a little." (*Id.*).

Plaintiff testified that during the course of a day he gets up at about 5:30 a.m., sits until about 8:15 a.m., takes his son to school, comes back home, sits, tries to watch television, sleeps a lot, then picks his son up at 3:40 p.m. from school, returns home, sits some more, watches television, eats, and goes to bed. (*PageID#* 126). He testified he rarely goes on the computer, and only to check e-mail. (*Id.*). Plaintiff can use the microwave to cook food, but other than that, his wife prepares his dinner. (*Id.*). Plaintiff stated his wife also does the laundry because he is unable to bend over to do it. (*Id.*). He also does not do any house cleaning or grocery shopping. (*PageID#* 127). He drives himself to his doctor's appointments. (*Id.*).

Plaintiff testified his back pain worsens when sitting or standing "too long," and with "movement." (*PageID#* 128). He stated that changing positions helps alleviate the pain. (*Id.*). Plaintiff estimates the most he can walk is a couple of blocks, and can stand for about 15 to 20 minutes. (*Id.*). He has no problems using his hands, and guesses he could lift approximately 20 pounds "once, twice maybe, and that would be from a chest level," but "I wouldn't try to pick anything up from the ground." (*PageID#* 129). Plaintiff uses a heating pad and "an ice thing that they gave me with surgery that pumps ice water through it and I use that a lot." (*Id.*).

As to his depression, Plaintiff stated he "pretty much stay[s] at home," and "I don't like to go anywhere, I get irritated and – I don't – my wife has a list of all the things that I do wrong." (*PageID#* 130). He stated he is "not too fond" of being around people. (*Id.*).

## B. Vocational Expert Testimony

A Vocational Expert (VE) testified at the administrative hearing. (*PageID##* 134-139). The VE identified Plaintiff's past work as an automobile mechanic (classified as medium, skilled work, performed at the very heavy level); exterminator (classified as light, semi-skilled work, performed at the very heavy level); and counter sales representative (classified as light, semi-skilled work, performed at the heavy level). (*PageID#* 136).

The VE was then asked to assume a hypothetical person has the residual functional capacity (RFC) to do the following:

> perform at the light exertional level with only occasional ramps and stairs, and occasional stooping, kneeling, crouching, and crawling; but no ladders, ropes or scaffolds; also . . . a severe mental impairment that is depression and therefore [a limitation] to low stress occupations, which are defined as only occasional changes to the work place setting, only occasional work place decision making required; and he's limited to 1 to 2-step tasks in an environment free from fast paced production requirements; with only occasional interaction with coworkers, supervisors; and only superficial contact with the general public . . . .

(*PageID#* 136). Provided with this RFC, the VE concluded Plaintiff would not be able to perform his past relevant work, "either as he actually performed the work or as those occupations are generally performed in the national economy." (*Id.*).

The ALJ then asked the VE to consider whether a person with the same age, education, work history, and RFC as Plaintiff could perform any occupations. (*Id.*). In response, the VE testified there are positions available, such as warehouse checker, copy machine operator, and mail clerk. (*PageID# 137*). According to the VE, these jobs number approximately 35,000 locally and 750,000 nationally. (*Id.*). Adding a sit/stand option to the same hypothetical would reduce the number of available local jobs to approximately 20,000, and the number of nationally available jobs to 150,000. (*Id.*). If the hypothetical worker could only perform sedentary work – with the same RFC otherwise – the VE testified there would be approximately 2,200 jobs available locally and a minimum of 30,000 jobs available nationally. (*Id.*). The VE stated he is describing the Dayton/Cincinnati area, consisting of an approximately 50-mile radius of Dayton, and containing approximately 1.3 million jobs. (*Id.*).

When cross-examined by Plaintiff's counsel, the VE stated that if the same hypothetical individual was not able to concentrate on a regular basis and was therefore off task for one-third or more of a work day, he or she would not remain competitive at any type of job. (*PageID# 138*).

## C.    Relevant Medical Evidence

Plaintiff injured his lower back in December 2005 when he slipped on ice. (Doc. #408). He went to a local urgent care and then the emergency room and was able to return to work a few days later. (*Id.*). Plaintiff's back pain worsened in June 2006 while performing his duties as a mechanic. (*Id.*). He underwent a lumbar spine MRI on June

6

27, 2006, which revealed a disc protrusion at L5-S1 level "with probable impingement to the right L5 nerve root as it exits through the right neural foramina." (*PageID# 406*). It also revealed a mild compression fracture of the L5 vertebral body appearing old, and minimal anular disc bulge at the L4-L5 level. (*Id.*). A second lumbar spine MRI performed in February 2007 showed multilevel mild diffuse disc bulges, mild narrowing at L5-S1, and straightening of the lumbar lordosis, but "[n]o acute lumbar spine fractures, disc herniations or central spinal canal stenosis." (*PageID# 401*).

On May 9, 2008, Plaintiff was seen by Dr. Kenneth Greene for a medical examination for workers' compensation. (*PageID## 407-12*). Dr. Greene noted that Plaintiff "was diffusely tender in the right lumbar paraspinal muscle tissue from approximately L3 to L5" and when "[i]n the seated position . . . experienced pain radiating down into the right foot . . . ." (*PageID# 411*). His muscle testing was 5/5 in all the major muscle groups of both lower extremities. (*Id.*). Dr. Greene deemed surgery "to be necessary and appropriate for [Plaintiff's] allowed condition of right radiculopathy and L5-S1 protruding disc." (*Id.*). He opined that Plaintiff's "[c]urrent work restrictions would include lifting and carrying approximately 20 pounds on an occasional basis with infrequent bending, twisting, turning, reaching below the knee, squatting, kneeling, and pushing and pulling. He should be able to change from a standing and walking position to sitting as needed. He should avoid ladders." (*PageID# 412*)

On May 23, 2008, an orthopedist, Dr. Jeffrey Hoskins, stated that he discussed surgery with Plaintiff, "which would be a decompression and fusion of L5-S1 to completely open up that foramen." (*PageID#* 415).

Plaintiff also continued treatment with his family physician, Dr. Gregory Dudash. (*PageID#* 428). Notes from a June 2008 appointment with Dr. Dudash indicated that Plaintiff reported symptoms such as agitation, irritability, moodiness, trouble sleeping, no motivation, and weight gain. (*Id.*). Dr. Dudash reported that Plaintiff had depression and leg edema. (*Id.*). A Dupplex Dopper was normal. (*PageID#* 430).

On June 19, 2008, Plaintiff saw George Schulz, Ph.D., for a consultative examination requested by the Ohio Bureau of Disability Determination. Plaintiff reported the main reason he was not able to work and why he is disabled is due to a bulging disk in his back and degenerative back disease. (*PageID#* 432). He described his family growing up as being dysfunctional and that he left home at the age of eighteen to join the military. (*Id.*). He graduated from high school and completed an Associates degree in Automotive Technology. (*PageID#* 433). He served in the Army from 1987 until 1993 when he was discharged with general honorable conditions. (*Id.*). He reported that he wakes up at 3:30 a.m. and goes to bed at 11:00 p.m. each day. (*Id.*). He is able to feed, bath, dress himself, and take care of his personal hygiene needs. (*Id.*). He does not do household chores, heavy lifting, household repairs, or yard work. (*Id.*). He has a driver's license. (*Id.*). He socializes with extended family on holidays and socializes with friends once a month. (*Id.*). His wife handles paying the bills, writing checks, and making

deposits.  (*PageID#* 434).  His "fund of knowledge" placed him in the "average" range.  (*PageID#* 435).  The diagnosis was depressive disorder NOS, and chronic pain.  (*PageID#* 435-36).

Vicki Casterline, Ph.D., completed a Psychiatric Review Technique on June 25, 2008.  (*PageID#* 441-54).  She determined that Plaintiff did not have a severe impairment.  (*Id.*).

Gary Hinzman, M.D., completed a Residual Functional Capacity Assessment on July 8, 2008.  (*PageID##* 455-462).  He opined that Plaintiff could do the following:  lift/carry 20 pounds occasionally; lift/carry 10 pounds frequently; stand/walk for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push/pull without limitation; frequently climb ramps/stairs; never climb ladders/ropes/scaffolds; and occasionally stoop, kneel, crouch, and crawl.  (*PageID#* 457).

Plaintiff treated with a chiropractor, Derek Black, D.C., from August 18, 2008 through February 11, 2009.  Plaintiff underwent aquatic therapy and physical therapy.  (*PageID##* 463, 466-73, 475, 481, 484-89, 492-95, 499-507, 534-38, 540-43, 546-48, 553-555).

Plaintiff also treated with Marcia Thomas, M.D., from June 14, 2006 through November 25, 2009.  Exams revealed positive straight leg raising test, reduced range of motion of lumbar spine, muscle spasms, diminished reflexes, decreased sensation, and tenderness of the paralumbar area.  (*PageID##* 673-74, 676-89, 691-92, 694).  He

experienced some improvement with epidural injections but pain increased after the shots wore off. (*PageID## 662, 671-72*). On August 11, 2009, Dr. Thomas noted that "it does not appear that he will be able to return to his job as a mechanic." (*PageID# 662*). In September 2009, Plaintiff's pain worsened. (*PageID# 660*). A month later, Plaintiff was experiencing crying spells, anxiety, and was more depressed. (*PageID# 657*). On December 9, 2009, Dr. Thomas noted that Plaintiff stated his symptoms had "improved somewhat with therapy, but never resolved to the extent that he could perform former work . . . ." (*PageID# 652*). Dr. Thomas reported Plaintiff's symptoms have been worsening since 9/09. (*Id.*). She also reported he can use upper extremities, but "cannot really use lower extremities due to pain, weakness." (*Id.*).

Plaintiff also treated with Amol Soin, M.D., at the Ohio Pain Clinic from July 2008 through September 2009. (*PageID# 627*). Dr. Soin stated that Plaintiff "has undergone the whole gamut of conservative treatment including a TENS unit, physical therapy, chiropractic manipulation, evaluation by a surgeon and conservative treatment with epidural steroid injections. He does not wish to undergo surgery at this point in time." (*Id.*). Plaintiff underwent a lumbar epidural steroid injection and a radiofrequency ablation treatment. (*PageID## 579, 582, 617, 619*).

Plaintiff underwent a MRI on October 4, 2009. At the L5-S1 level it revealed a "mild narrowing of the vertebral disk space. Surrounding hyperthrophic degenerative changes are seen along with facet arthrosis. Effacement to the ventral surface of the thecal sac related to the mild anular bulge. There is moderate narrowing of the right

neural foramina. The left neural foramina is severely narrowed. Conjoined left-sided nerve root is seen. Left S1 nerve root is asymmetrical, appearing larger than that of the right." (*PageID#* 592).

On October 12, November 3, and November 25, 2009, Dr. Thomas completed a form indicating Plaintiff was "totally disabled" from his work duties. (*PageID##* 697-700). She completed the same form and found him "totally disabled" on February 23, 2010. (*PageID#* 798). Dr. Thomas also completed the same form on August 11, May 26, and March 10, 2009, as well as October 23, September 11, August 13, June 24, May 13, April 1, March 4, and January 24, 2008. (*PageID##* 702-13). On these dates, Dr. Thomas indicated Plaintiff could return to work, with restrictions. (*Id.*).

On February 22, 2010, Leslie Rudy, Ph.D., completed a Psychiatric Review Technique. (*PageID##* 778-792). She opined that Plaintiff had moderate restrictions in his activities of daily living; moderate restrictions in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*PageID#* 788).

Damian Danopulos, M.D., evaluated Plaintiff on March 8, 2010, at the request of the state agency. Dr. Danopulos indicated that Plaintiff appeared for examination with a cane which he had been using since June 2009. (*PageID#* 801). Plaintiff's upper extremities revealed full range of motion. (*PageID#* 804). Both hips revealed normal but painful motions. His gait was normal without ambulatory aids, but spine was painful to pressure in the lumbo/sacral spine. (*Id.*). Bilateral straight leg raising was triggering bilateral hip pain, as was squatting and arising from squatting. (*Id.*). Plaintiff's LS spine

motions were restricted and painful. (*PageID#* 805). Danopulos's diagnoses were lumbar spine mild diffused degenerative arthritis, bilateral hip arthralagias, bilateral knee arthralgias, bilateral calf neuralgias, bilateral little toe neuralgias, morbid obesity, and depression. (*Id.*)

Gerald Klyop, M.D., completed a Residual Functional Capacity Assessment form on April 19, 2010. (*PageID#* 818). He believed Plaintiff could do the following: lift/carry 20 pounds occasionally; lift/carry 10 pounds frequently; stand/walk about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push/pull without limitation. (*PageID#* 812). He also opined Plaintiff could frequently climb ramps/stairs, could never climb ladders/ropes/scaffolds, and could occasionally stoop, kneel, crouch, and crawl. (*PageID#* 813). John Waddell, Ph.D., reviewed the evidence on September 2, 2010, and affirmed the MRFC dated 2/22/2010. (*PageID#* 822). Elizabeth Das, M.D., reviewed the evidence on September 9, 2010, and affirmed the RFC dated 4/19/2010. (*PageID#* 921).

On September 17, 2010, Plaintiff underwent a transpedicular L5-S1 extraforaminal discectomy with facetectomy and foraminotomy and a spinal fusion. (*PageID##* 960-61). Dr. Taha saw Plaintiff after the operation, and he was doing relatively well with no major complaints from surgery. (*PageID#* 1011).

Dr. Thomas completed interrogatories in July 2011. (*PageID#* 1021). She noted that Plaintiff could frequently lift 10 pounds, and can only stand/walk for 2 hours in an 8-hour workday, with a break every 15 minutes. (*PageID#* 1013). Dr. Thomas opined that

Plaintiff could sit in one position for 30-45 minutes, "depending on the support of the chair," for 4 to 6 hours in an 8-hour workday, provided he is able to change positions every 30 minutes. (*Id.*). Plaintiff could do the following: occasionally climb stairs, but never ladders; frequently balance; rarely stoop, crouch, and kneel; and never crawl. (*PageID#* 1014). Dr. Thomas opined that Plaintiff experiences pain with reaching, and pushing/pulling "too much." (*Id.*). She also opined that Plaintiff should be restricted from heights and moving machinery. (*Id.*). She concluded that Plaintiff has the residual functional capacity on a sustained basis to do sedentary work, "if able to change positions as needed to get comfortable." (*Id.*). But, she did note that he "would have difficulty even in a sedentary job due to trouble sitting in most chairs [and] need[s] to change positions every 15 minutes or so." (*PageID#* 1016).

Plaintiff's treating psychiatrist, Jack Lunderman, Jr., M.D., completed interrogatories on October 6, 2011. The diagnosis was depressive disorder NOS. (*PageID#* 1060). He believed Plaintiff could not do the following: be prompt and regular in attendance; withstand the pressure of meeting normal standards of work productivity and work accuracy without significant risk of physical or psychological decompensation or worsening of his physical and mental impairments; sustain attention and concentration on his work to meet normal standards of work productivity and work accuracy; and maintain concentration and attention for extended periods; complete a normal work day and work week without interruption from psychologically and/or physically based symptoms and perform at a consistent pace without unreasonable number and length of

rest periods.  (*PageID#* 1060-68).  He had a marked restriction of his daily activities and social functioning, as well as marked to extreme deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner.  (*PageID#* 1068).

## III.    Administrative Review

### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    Social Security Regulations

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See PageID##* 68-70; *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's

review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete

sequential review answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can he perform his past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**C.      ALJ Withum's Decision**

Plaintiff last met the insured status requirements of the Social Security Act through

December 31, 2013.  (*PageID# 72*).

At Step 2 of the sequential evaluation, the ALJ concluded that Plaintiff has the

severe impairments of degenerative disc disease of the lumbar spine with stenosis and

radiculopathy, morbid obesity and major depressive disorder.  (*Id.*).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or

combination of impairments that met or equaled one of the Listings.  (*Id.*).

At Step 4, the ALJ evaluated Plaintiff's RFC and found that he could perform

sedentary work, subject to the following requirements: he must be allowed to sit or stand

15

at will, provided that he is not off task more than 10% of the work period; he can only occasionally climb ramps or stairs, stoop, crouch, kneel or crawl; he cannot climb ladders, ropes or scaffolds; his work must be limited to 1-2 step tasks in an environment free of fast-paced production requirements; his job must be low stress, with only occasional decision-making required and only occasional changes in the work setting; and he cannot interact with the public and can only occasionally interact with co-workers and supervisors. (*Id.*).

The ALJ concluded at Step 4 that Plaintiff was unable to perform his past relevant work as an exterminator, auto mechanic, material handler, and counter sales representative. (*PageID# 79*).

At Step 5, based on testimony from the VE, the ALJ concluded that – considering Plaintiff's age, education, work experience, and RFC – he is capable of performing a significant number of jobs in the national economy. (*PageID# 80*).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability, and thus not eligible for DIB or SSI. (*Id.*).

## IV. <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.    Discussion**

Plaintiff contends the ALJ erred in rejecting the opinions of his treating physician, Dr. Thomas. (Doc. #8, *PageID#* 1214). According to Plaintiff, "although [the ALJ] properly rejected the opinions of the non-examining State agency reviewers, there was no medical opinion by any doctor that was contrary to the opinion of Dr. Thomas." (*Id.*).

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Id.*

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or

reject) the opinions of a non-treating medical source. *See id*. at \*2-\*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p at \*2-\*3.

The Commissioner contends "[t]he ALJ discussed most, if not all, of the factors enumerated in SSR 96-2p, therefore, she followed the correct legal standard when evaluating Dr. Thomas's opinion." (Doc. #11, *PageID#* 1242).

The Regulations require ALJs to "always give good reasons ... for the weight [they] give [a claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Social Security Ruling 96-2p, 1996 WL 374188 (July 2, 1996) provides further that an ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in this case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*., 1996 WL at \*5. The good-reasons requirement is "a mandatory procedural protection ...." *Wilson*, 378 F.3d at 546.

In considering Dr. Thomas's opinions, ALJ Withum first correctly noted that Dr. Thomas had treated Plaintiff since 2005. The ALJ then "grouped" Dr. Thomas's opinions into three categories, as follows:

First, as of February 19, 2008, she opined that the claimant would be off work for 12 weeks and was unable to heavy lift, push, pull, or do repetitive or prolonged bending. (Ex. 19F/66). The duration of this restriction is sufficient to be given much weight, although I do not disagree with her findings that the claimant cannot perform heavy lifting. Second, beginning in June 2008, she allowed the claimant to return to work with standing or walking limited to 4 hours, with occasional lifting up to 30 lbs., occasional postures. (*Id.* at 13). This opinion coincided with reduced symptoms of epidurals and aquatic therapy. (Ex. 29F/32, 94). Since her opinion is less restrictive than my own residual functional capacity, it does not particularly help the claimant's argument for disability. I find a sedentary residual functional capacity is more appropriate, for the reasons I identify in the previous paragraphs.

By November 2009, however, Dr. Thomas' view changed. (Ex. 19F/1). She believed the claimant to be totally disabled. (*Id.*). She repeated this assertion without much explanation in May 2010. (Ex. 29F/34). After the claimant's back surgery, she stuck to this claim in July 2011. (Ex. 39F/13). However, she clarified "except under supervision of physical therapist" and believed the claimant could lift l0 lbs., walk for up to 2 hours total (10-15 minutes at a time) and could occasionally climb stairs, rarely crouch, kneel and stoop. (Ex. 38F). She limited the claimant's exposure to heights and moving machinery and said he could never crawl. (*Id.*). She even said that the claimant could perform sedentary work if able to change positions as needed. (*Id.*). Unfortunately, Dr. Thomas' opinion is internally inconsistent in the sense that she simultaneous[ly] believes that the claimant could perform sedentary work and yet is still disabled. As I will discuss later in this decision, the vocational expert found jobs with a sedentary residual functional capacity and sit-stand option. Further, Dr. Thomas' opinion that the claimant is totally disabled is inconsistent with his significant improvement post back surgery. The improvement is seen both in the claimant's subjective reporting of his problems, examination findings and the summaries of numerous doctors. (Exs. 46F/2; 39F/4, 6; 44F/6; 45F; 42F/30-31). Even before his surgery, Dr. Thomas' finding of disability applied only between November 2009 and September 2010 (the date of his fusion ) – a period of less than one year.

(*PageID## 78-79*)(footnotes omitted).  Despite Plaintiff's contentions otherwise, the ALJ provided "good reasons" for discounting Dr. Thomas's opinions.  First, the ALJ noted that while Plaintiff alleged an onset disability date of February 11, 2008, Dr. Thomas indicated on a Greene Memorial Hospital "WorkPlus" form – presumably for Plaintiff's employer or workers' compensation – that Plaintiff could return to work, with restrictions, in June 2008.  (*Id.*).  The record also indicates Dr. Thomas cleared Plaintiff to return to work, with restrictions, on August 13, September 11, October 23, and December 10, 2008, as well as March 10, May 26, August 11, and September 16, 2009.  (*PageID## 701-708*).  Thus, as late as September 2009, Dr. Thomas still cleared Plaintiff to return to work, with restrictions.

On September 29, October 12, November 3, and November 25, 2009, Dr. Thomas completed additional "WorkPlus" forms, only now she indicated Plaintiff was "totally disabled," defined on the form as "totally incapacitated and . . . unable to perform any job related duties at this time.  The individual may be released for restricted or unrestricted duty following the next scheduled appointment."  (*PageID## 697-700*).[2]

Dr. Thomas also indicated Plaintiff was "totally disabled" on July 20, October 19, and December 21, 2010, as well as January 18, March 8, June 29, and July 26, 2011.

---

[2] Although the definition of "totally disabled" provided on the form indicates the individual "is unable to perform any job related duties," it is unclear as to whether this refers only to job related duties associated with the individual's current employment or all jobs that exist in the economy.  For purposes of resolving this issue, however, the Court will adopt Plaintiff's interpretation that the form indicates he is unable to perform all job related duties in the economy, not just all job related duties of his then-position as a mechanic.

(*PageID##* 1035-1041).  Yet on the same day Dr. Thomas completed the "WorkPlus"

form indicting Plaintiff was "totally disabled" in July 2011, she also completed a Medical

Assessment of Ability to Do Work-Related Activities (Physical) form indicating that she

believed Plaintiff had the residual functional ability on a sustained basis (in an eight hour

work day) to do sedentary work, "if able to change positions as needed to get

comfortable."  (*PageID#* 1016).   "Sedentary work" was defined on the form as the ability

to "lift 10 lbs. maximal/or carry such articles as small tools.  Such work involves

primarily sitting but the individual can sit/stand and walking/standing is required only

occasionally."  (*Id.*).

Thus, the ALJ correctly noted, and relied upon, this inconsistency when rejecting

Dr. Thomas's opinion.  *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927

(6th Cir. 1987) (ALJ is not bound by the disability opinion of a treating physician who

provides conflicting opinions throughout relevant time period); *see Render v. Sec'y of

Health & Human Servs.*, 872 F.2d 1028, 1989 WL 34104, *3 (6th Cir. 1989)(proper to

discount treating physician's opinion which was internally inconsistent).  Moreover, the

ALJ also properly noted that Dr. Thomas's opinions of "total disability" were not

supported by Plaintiff's significant improvement after back surgery, and that Dr. Thomas

provided no explanation for the change in her disability determination starting on

September 29, 2009 – less than two weeks after indicating Plaintiff could return to work,

with restrictions, on September 16, 2009.  *See PageID##* 700-01.  Although Plaintiff

appears to argue the change in opinion can be attributed to a MRI of Plaintiff's lumbar spine performed around the same time, Doc. #8, *PageID#* 1219, this argument lacks merit as Dr. Thomas issued her first "totally disabled" opinion five days *prior* to the MRI performed on October 4, 2009. (Doc. ## 592, 700). The Regulations explain, "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion . . . ." *See* 20 C.F.R. § 404.1527(d)(3). Accordingly, the ALJ did not err in rejecting Dr. Thomas's "total disability" opinions as they were internally inconsistent and not supported by the evidence.

Rather than relying on the opinion of Dr. Thomas, the ALJ provided weight to the opinions of Drs. Kylop and Das. (*PageID#* 78). Dr. Kylop, a non-examing physician, reviewed the record on April 19, 2010, and gave weight to the opinion of the consultative examiner, Dr. Danopulos, dated March 15, 2010. (*PageID##* 805, 811-818). Dr. Kylop opined that Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, sit/stand/walk for about 6 hours in an 8-hour workday, and push/pull without limitation. (*PageID#* 812). Dr. Das reviewed the evidence on September 9, 2010, and affirmed the RFC dated 4/19/2010. (*PageID#* 921). The ALJ did not, however, provide these opinions "full weight" as she concluded "they do not adequately take into account the claimant's worsening of symptoms between September 2009 and his fusion, nor do they discuss the effects of his obesity . . . ." (*Id.*). Nonetheless, the ALJ provided these opinions with some unspecified amount of weight – albeit less than "full weight" – yet

never indicated that she applied the factors set out in 20 C.F.R. § 1527(c) to these opinions – supportability, consistency, specialization. This is problematic, as providing "more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c); Soc. Sec. Rul. No. 96-6p, 1996 SSR LEXIS 3 at *5, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)). It also indicates the ALJ's decision is without substantial evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)("An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'")(citing *Blakley*, 581 F.3d 399, 407 (6th Cir. 2009)(citations omitted)).

Plaintiff also argues the ALJ failed to provide good reasons for rejecting the opinion of his treating psychiatrist, Dr. Lunderman. (Doc. #8, *PageID#* 1214). A review of the record, however, indicates the ALJ did provide good reasons for rejecting this doctor's opinion. For example, while Dr. Lunderman indicated in September 2011 that he had been treating Plaintiff since June 2010, it appears Plaintiff only treated with him approximately seven times during that time. (*PageID##* 1046-58). Although not itself dispositive of the issue, the few treatment notes available from these seven or so visits often indicated stable mood and affect, normal thoughts, and normal sleep. (*Id.*). Thus, the ALJ did not err by finding that Dr. Lunderman's opinion lacks consistency, "even with his own sparse examination notes regarding the claimant's concentration deficits."

(*PageID#* 79); 20 C.F.R. §§404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.")

In addition, it is important to note that Dr. Lunderman only stated in October 2011 that Plaintiff was "not able to work productively in any manner *at this time* . . . ." (*PageID#* 1117) (emphasis added). Although Dr. Lunderman also noted that Plaintiff's prognosis was "poor," he did not state how long he expected Plaintiff "not [to be] able to work productively. . . ." *Id.* To constitute a benefits-qualifying "disability," however, a claimant's medically determinable impairment must last, or be expected to last, a continuous period "of not less than twelve months." 20 C.F.R. § 404.1505(a). As a result, even if fully credited, Dr. Lunderman's opinion only indicates Plaintiff could not, *at that time*, "work productively." It does not, however, indicate how long such an inability to "work productively" could be expected to last, and accordingly, does not show that he met the disability durational requirement. Although the ALJ had good reasons for rejecting the opinion of Dr. Lunderman, she again failed to properly analyze the opinions of Drs. Rudy and Waddell, which she gave "great weight." As to these reviewing physicians' opinions, the ALJ gave them "great weight" for the following reasons:

> These doctors found that that [sic] claimant could perform simple and familiar multistep tasks without a [sic] fast pace or high production requirements or frequent changes. (Exs. 20F; 28F). They also said he cannot interact with the general public and can otherwise interact on a superficial basis. (Exs. 20F; 28F). I incorporated these opinions into my residual functional capacity by limiting the claimant to 1-2 step tasks in a low stress job with only occasional interactions with others, except for no interactions with the general public. These restrictions are

25

justified by the claimant's recurring depression and concentration difficulties (although no more than moderate as I discussed above).

(*PageID#* 79).  Yet the ALJ again failed to indicate she applied the factors set out in 20 C.F.R. § 1527(c) to these opinions – supportability, consistency, specialization. Accordingly, the ALJ's decision is without substantial evidence on this basis as well.  *See Cole*, 661 F.3d at 937 (citing *Blakley*, 581 F.3d at 407).

For these reasons, Plaintiff's Statement of Errors is well taken.

## VI.   <u>Remand is Warranted</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social

26

Security Administration pursuant to Sentence Four of § 405(g), due to the problems identified above. On remand, the ALJ should be directed to: (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) determine anew whether Plaintiff was under a disability and thus eligible for DIB and/or SSI during the period in question.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff David Binegar was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and,

4. The case be terminated on the docket of this Court.


June 10, 2014


_____s/Sharon L. Ovington_____
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).